**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

WILLIAM T. LENZ,

                       Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                       Defendant.

Case No.: 3:16-cv-01755-JLS (PCL)

**REPORT AND
RECOMMENDATION:**

**GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

      On July 7, 2016, Plaintiff William T. Lenz ("Plaintiff" or "Claimant") filed this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("Act"). (Dkt. No. 1.) Through the suit, Plaintiff seeks for this Court to review the final decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's application for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 401 *et seq*. (*Id.* at 1-2.) Plaintiff filed a motion for summary judgment on May 12, 2017 and Defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, filed a cross-motion for summary judgment on June 9, 2017. (Dkt. Nos. 14 & 15.)

      The Honorable Janis L. Sammartino referred the matter to undersigned judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Upon careful consideration of the moving papers, the administrative record, the applicable law, and for the foregoing reasons, the Court **RECOMMENDS** that the District Court **GRANT** Plaintiff's motion for summary judgment and **DENY** Defendant's motion for summary judgment.

## I. INTRODUCTION

Claimant filed an application for supplemental security income, alleging disability, on April 12, 2012. (Exhibit 10, Administrative Record ("AR") 140.) An individual is disabled within the meaning of the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (i)(1)(A); *see also* 42 U.S.C. § 423(d)(1)(A) (near identical standard for disability insurance benefits). In his application, Lenz states that he has been disabled since March 13, 2009 due to conditions ranging from depression, to left leg swelling and clotting, to right hip degeneration. (Exhibit 1E, AR 158.)

The Social Security Commissioner employs a five-step sequential process for determining whether a claimant is disabled. *See Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (citing 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f)). Those five steps, in short, require the reviewing administrative law judge ("ALJ") to determine: (1) whether the claimant is presently working in a substantially gainful activity; (2) whether the claimant's impairment is severe; (3) whether the impairment "meets or equals" one of the specific impairments described in the code; (4) whether the claimant can perform any past relevant work; and (5) whether the claimant can do any other work. 20 C.F.R. § 202.1520(b)-(f), 416.920(b)-(f). The claimant bears the burden of proof at steps one through four, but the ALJ has the burden of proof at step 5. *See Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).

The SSA denied Plaintiff's disability application initially and upon reconsideration. (*See* Exhibit 2B, AR 54-55; Exhibit 6B, AR 64.) After these denials, Plaintiff exercised his right to request a hearing before an ALJ. (Exhibit 7B, AR 69.) A hearing took place on August 28, 2014. (Exhibit 10B, AR 85.) After listening to testimony from Claimant — who was represented by counsel — and a vocational expert, the ALJ concluded that Claimant was not disabled. (ALJ Decision, Nov. 26, 2014, AR

31-32.) Specifically, the ALJ found that Claimant failed step 5 of the Commissioner's sequential analysis because he was capable of making a "successful adjustment to other work that exists in significant numbers in the national economy," namely, work as a production line solderer or work as a document preparer. (*Id.*) The ALJ concluded that Claimant was capable of performing these jobs because Claimant had the residual functional capacity to perform "light work" subject to certain limitations.[1]

Claimant timely requested that the Appeals Council review the ALJ's decision. (Request for Review of Hearing Decision/Order, Jan. 23, 2015, AR 13.) The Appeals Council denied Claimant's request for review. (Notice of Appeals Council Action, May 19, 2016, AR 5.) In so doing, the Appeals Council adopted the ALJ's decision as the final decision of the Commissioner. *Id.*; *see also* 42 U.S.C. § 405(h). Claimant timely filed for review of the Commissioner's final decision on July 7, 2016. 42 U.S.C. § 405(g); 20 C.F.R. § 404.981 ("You may file an action in a Federal district court within 60 days after the date you received notice of the Appeals Council's action.").

## II. REVIEW OF FINAL AGENCY DECISION

Claimants who are denied disability benefits are entitled to seek review of the Commissioner's final agency decision in U.S. district court. 42 U.S.C. § 405(g). A reviewing court may reverse the Commissioner's denial of benefits only if the decision is not supported by substantial evidence or if it is based upon legal error. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). Substantial evidence means "relevant evidence, which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995); *see also Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.

---

[1] The residual functional capacity assessment requires an ALJ to inquire into what a claimant can still do notwithstanding his or her physical, mental and other limitations. 20 C.F.R. § 404.1545(a), § 416.945(a). The regulations define "light work" as that which requires lifting up to twenty pounds, with frequent lifting and carrying of objects up to ten pounds, and which requires a good deal of walking or standing or sitting with pushing and pulling controls. 20 C.F.R. § 416.967(b).

1996) (defining "substantial evidence" as more than a scintilla, but less than a preponderance).

Courts are required to view the record as a whole when determining whether substantial evidence exists to support the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). This means that courts must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Id.* If the evidence in the record is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, a court must uphold the denial of benefits. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). On the other hand, even if there is substantial evidence in the record to support the ALJ's decision, a reviewing court must set aside the decision if the ALJ failed to apply the proper legal standard in weighing the evidence and reaching a conclusion. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). A court will not reverse a decision if the error was harmless. *Burch*, 400 F.3d at 679.

## III. FACTUAL BACKGROUND

Plaintiff, a current resident of Salton City, California, was born on December 18, 1964. (Compl. ¶ 1; AR 164.) He was 47 years old at the time he filed his application and is currently 52 years old. (*See* AR 21.) Prior to applying for disability benefits, the highest level of education that Plaintiff had achieved was the twelfth grade. (AR 159.) He graduated from high school in 1983 and partook in special education classes all four years. (*See id.*) Lenz had no specialized job training, trade or vocational degree prior to submitting his application to the SSA. (*See id.*) He worked four distinct jobs during the fifteen years prior to his application for disability benefits. (*See* AR 172, 159.) Specifically, he worked as a chef at a country club, a manager at a restaurant, an apprentice plumber, and a retail clerk at a thrift store.[2] (*Id.*)

---

[2] The Court observes that the dates Claimant performed these jobs are not clear from the record. For example, in the "Work History Report," Plaintiff reports that he worked as a supervisor at a restaurant from 2002 to 2003, but the record in his "Disability Report" states that he worked that same job from 1995 to 1996. *Compare* AR 179 *with* AR 159. These discrepancies, however, are not ultimately material for the reasons stated *infra*.

## A. Relevant Medical Evidence

By Plaintiff's account he became disabled in June 2009 due to learning problems, including dyslexia, depression, a "frozen neck," degenerating shoulders, spinal problems, right hip degeneration and other hip problems, recurrent left leg swelling after two hours on feet, blood clots, and "popping veins" in the left leg. (Exhibit 10, AR 140; Exhibit 1E, AR 158.) The following summarizes the medical evidence submitted by Plaintiff in support of his alleged disability, as well as opinion evidence from various medical professionals, and opinion evidence from a vocational professional who testified at the hearing.

### 1. History of Treatment

### a. Spine, hips, shoulders

Beginning in November 2006, Claimant began a course of treatment at the Borrego Medical Center ("BMC"). (Exhibit 6F.) While attending BMC for care, Claimant saw Dr. Robert C. Haynes, M.D., a radiologist, on a number of occasions. On November 17, 2006, Dr. Haynes concluded that Claimant had "mild thoracic spine ankylosis and osteophytosis" and that he had "mild degenerative disc disease," "early cervical ankylosis," and "small posterior osteophytes" in his cervical spine. (Exhibit 6F, AR 320-21.)

Five years later, in September 2011, Dr. Haynes examined Claimant's right shoulder and determined that he had "subtle degenerative changes." (*Id.* at 319.) At that time, Dr. Haynes yet again examined Claimant's thoracic and cervical spine and noted "[a]dvanced findings of ankylosing spondylitis involving the cervical and thoracic spine." (*Id.* at 318.) Dr. Haynes further recommended "obtaining sacroilliac joint images if this [the former] diagnosis is not known or in question." (*Id.*)

A week after reporting these findings, Dr. Haynes examined Claimant's sacroilliac joints. (*Id.* at 317.) His impressions were the following: "Moderate bilateral sacroilitis. Rule out ankylosing spondylitis." (*Id.*) Shortly thereafter and at the request of James Huot, M.D., a physician at BMC, a Dr. Raymond Sung performed an MRI of Plaintiff's

sacrum. (*Id.* at 323.) Dr. Sung concluded that Claimant had "partial ankylosis of the bilateral SI [sacroiliac] joints" in addition to enhancement of "left hip effusion" and enhancement of "the left acetabulum." (*Id.*)

In the meantime and while seeking treatment at BMC for issues relating to his legs and vascular system, *see infra* Section III.A.1.b, Claimant's primary caretaker at BMC, Janice Jones, N.P., noted various issues related to Claimant's neck, back, hip, and shoulder pain. For instance, on September 8, 2011, Nurse Jones recorded that Plaintiff had "[d]ifficulty rising from chair" and an "[a]ntalgic gait." (*Id.* at 301.) Shortly thereafter, on October 21, 2011, Claimant reported that he was "[u]nable to turn head to drive." (*Id.* at 303.) Nurse Jones, in response, examined Claimant and noted that he "[d]oes not stand straight, head is forward his cervicle [sic] area. Lateral rotation is decreased. Unable to turn chin to shoulder. When bending forward right shoulder is lower than left[.]" (*Id.*) By December, 14, 2011, however, Nurse Jones reported that Plaintiff had a "[n]ormal range of motion in his neck." (*Id.* at 290.)

Yet some months later, on August 6, 2012, Claimant again complained of pain, stating that he was unable "to put his own shoes on secondary to pain in his neck and legs." (*Id.* at 267.) Shortly thereafter, Nurse Jones examined Plaintiff and determined that he yet again had a "decrease[d] ROM (range of motion)" in his neck. (*Id.* at 265.) Specifically, she stated that his "Flexion was limited to about 5 degrees and lateral rotation to 45 degrees." (*Id.*)

The following year, in January 2012, Dr. Haynes performed an exam of Claimant's hips and chest. (*Id.* at 317.) While he concluded that Claimant's right hip joint was normal he further concluded that his left hip might have mild osteoarthritis or "stigmata of possible old subcapital fracture." (*Id.*) Some months afterwards, Dr. Haynes examined Claimant's chest and observed that "vertebral ankylosis is present." (*Id.* at 315.)

In the years that followed, Claimant's primary care physicians, both at BMC and Clinicas de Salud del Pueblo (where he sought care after moving to Salton City),

continued to observe that Plaintiff's gait was antalgic and that he had decreased range of motion in his neck and spine.  (AR 395, Aug. 15, 2013, "Decreased ROM with crepitus in both shoulders. Tender both hip with no warmth, redness, or edema. . . . Antalgic gait with left should[er] lower than right.  Head is forward on spine when sitting or ambulating."); (AR 384, Nov. 13, 2013, "Shoulders showed abnormalities. Muscle spasm of the shoulders. Motion of the shoulders was abnormal Decreased ROM. Neurovascular intact."); (AR 381, Dec. 18, 2013, "Gait is antalgic. Decreased ROM off [sic] cervical spine, particularly lateral rotation."); (AR 564, Jan. 7, 2014, "Gait is limp, left side, full weight bearing and cane."); (AR 483, July 3, 2014, "Gait is limp, left side and cane.")

### b.  Left leg

#### i.    First hospitalization & subsequent treatment

On February 21, 2011, Plaintiff sought treatment for his leg in the emergency room of the John F. Kennedy Hospital in Indio, California.  (Exhibit 14, AR 366.)  Claimant presented with pain and swelling in his left lower extremity that had developed three or four days prior.  (*Id.* at 366.)  A Nancy Onisko, M.D., examined Plaintiff.  (*Id.* at 367.)  An ultrasound of Plaintiff's left leg revealed a deep vein thrombosis ("DVT") that extended from the femoral artery down to the popliteal artery.  (*Id.*)  The emergency room doctor's final diagnosis was "[a]cute lower extremity deep venous thrombosis." (*Id.*)

Thereafter, Claimant was admitted into the hospital under the care of Assad Darawal, M.D.  (*Id.*)  The following day, a Nanette Kovash, M.D., performed a computed tomography angiogram ("CTA") of Claimant's chest.  (*Id.* at 369.)  At the end of her report, Dr. Kovash included the following in her final impression: (1) acute pulmonary embol[ism] in the right lower lobe, with questionable right upper and left lower lobe PE [pulmonary embolism] as well; (2) large left greater than right apical bullous disease; (3) trace right effusion; (4) ankylosing spondylitis.  (*Id.*)

Dr. Darawal discharged Claimant from the hospital a little over a week later on March 1, 2011.  (*Id.* at 363.)  Dr. Darawal's discharge summary included three diagnoses

for "acute deep venous thrombosis," "pulmonary embolis", and "tobacco us disorder." (*Id.*)  In his summary of Claimant's present illness, Dr. Darawal stated that "Patient was found to have a massive right DVT," "acute pulmonary embolism in the right lower lobe," and "ankylosing spondylitis."  (*Id.*)  In the "followup" section, Dr. Darawal advised Claimant that he should regularly see a primary care physician.  (*Id.*)  More specifically, Dr. Darawal advised Claimant to have his PT (prothrombin time) assessed in three days and on a weekly basis thereafter.  (*Id.*)  Dr. Darawal also advised Claimant "to be on anticoagulation [i.e., the drug Coumadin] for the rest of his life, indefinitely" due to the "massive DVT and positive lupus anticoagulant."  (*Id.* at 363, 365.)

Thereafter, Claimant sought outpatient care at Borrego Medical Center from May 19, 2011 to December 3, 2012.  (*See* Exhibit 6F, AR 251-310.)  While attending BMC, Claimant was treated and examined primarily by Nurse Jones.  (*See generally id.*)  On a few occasions, Dr. Huot tended to Claimant.  (*See, e.g.*, AR 271, 283.)  The primary purpose of Claimant's visits to BMC, during this period, was to perform PT tests, obtain prescription refills, receive laboratory results, and monitor his Coumadin intake.  (*See, e.g.*, AR 253, "The Chief Complaint is: Protime Check"); (AR 267, "rx refill"); (AR 271, "lab results"); (AR 307, "coumadin management").[3]

At his first visit post-hospitalization, Claimant informed Nurse Jones that "He no longer has swelling in his legs and feet" and that "He is no longer having to use a wheel chair."  (AR 312.)   In her assessment of Plaintiff, Nurse Jones listed "[c]hronic anticoagulant use" and "[a]cute venous thrombosis of the deep vessels of the lower extremity" as the relevant medical issues.  (*Id.*)

/ / / /

---

[3] The Borrego Medical Center also treated Claimant for a number of non-leg related issues after his hospitalization at JFK hospital.  For example, on April 15, 2012, he presented himself for a depression screening (AR 276), and on February 1, 2012, he complained of right eye irritation (AR 286).  During this time period, BMC also performed X-rays and an MRI of Plaintiff's back in order to diagnose ankylosis spondylitis, as discussed *supra* Section III.A.1.a.

### ii.    Second hospitalization & subsequent treatment

Claimant found himself in the emergency room yet again on January 1, 2013. (Exhibit 16F, AR 427-41.)  Plaintiff presented himself to Pomerado Hospital in Poway, California with "[l]eft leg pain and swelling" and a "loose scab on the left lower extremity right about the ankle." (*Id.*)  After performing an ultra sound of Claimant's leg, an emergency room doctor concluded that he had "deep venous thrombosis of the left common femoral vein and left popliteal vein." (*Id.* at 429.)  Pomerado discharged Claimant three days later on January 6, 2013 in stable condition. (*Id.* at 430.)  About a month after leaving the hospital, Claimant received leg-related outpatient care at BMC. (*See* AR 408, Feb. 19, 2013, "Here for Una boot change. Leg feel better. . . . Difficult to obtain pedal pulse.")[4]

### iii.    Third hospitalization & subsequent treatment

Plaintiff made another emergency room visit to Pomerado on June 23, 2013. (*Id.* at 421-27.)  At that time, emergency room physician Thomas Moats, M.D., recorded that Claimant presented "with leg wound with pain and swelling" that "recently began to swell and weep clear fluid, with increasing pain that [ ] radiates up to the knee and thigh." (*Id.* at 421.)  Upon examining Claimant, the physician determined that Plaintiff has "chronic DVT of the left lower extremity with findings consistent with nonhealing venous stasis ulcer." (*Id.* at 423.)  Dr. Moat's final diagnosis was that Plaintiff had a "left lower extremity cellulitis with nonhealing venous stasis ulcer." (*Id.*)  Plaintiff was subsequently discharged from Pomerado in stable condition with instructions to go to a wound care center or primary physician. (*Id.*)

After being discharged from Pomerado, Claimant sought wound care treatment at BMC. (*See, e.g.*, AR 403, June 26, 2013, "Seen at Pomerado ER for increased swelling,

---

[4] The record also gives strong indication that Claimant saw a vascular specialist, a Dr. Califano. *Compare* AR 409 ("Vascular Surgery . . . Has appointment with Dr. Califano.") *with* AR 421 (". . . he is followed up with vascular surgery with noted persistent clot at that time and did not feel an IVC filter was required.").

pain and drainage from the ulcer on the left leg.  Also had Doppler which showed a continued clot in the upper leg. . . . Ulcer inner aspect left leg with surrounding erythema approximately 5 x 7 cm. Pedal pulse palpable."); (AR 401, July 2, 2013, "recheck of ulcerated wound on his left inner ankle. . . . Large, 3 x 5 cm crusted lesion on inner aspect with mild surrounding erythema but no discharge.  Wound cleaned and dressed using Wound Gel."); (AR 400, July 17, 2013, "Leg feels better.  Using wound gel. . . . Patchy area on inner aspect left leg dry, no drainage."); AR 399 (July 24, 2013, ". . . left leg shows slight improvement.")  Thereafter, Claimant continued to present himself to BMC for PT checks and prescription refills.  (*See, e.g.*, AR 380-98.)

### iv.    Course of treatment post-hospitalizations

Claimant's leg-related issues continued into the fall and winter of 2013.  On October 10, 2013, he sought treatment at BMC because his left leg had been swollen for two weeks."  (AR 388.)  Nurse Jones proceeded to observe that Claimant had "[o]pen lesions" on his "left lower leg with surrounding erythema."  (*Id.*)  A few months later, on December 4, 2013, Nurse Jones examined Claimant and noted that he had "Ulceration on left lower leg beginning to break down a little.  Leaking lymph.  Surrounding area is dry without evidence of infection."  (AR 382.)  Nurse Jones yet again examined Plaintiff on December 18, 2013 and observed "Left leg with stasis ulcer, minimal serosanguinous drainage."  (AR 381.)

Beginning in 2014 and after Claimant moved with his family to Salton City, California, Claimant began to seek outpatient care related to anticoagulation prevention at the Clinicas de Salud.  (*See generally* Exhibit 18F, AR 475-574.)  The physicians that treated Claimant while at Clinicas de Salud continued to note medical issues related to his left leg.  (AR 559, Jan. 21, 2014, "6 cm oval area of darkened skin with small ulcers within area seen."); (AR 552, Jan. 28, 2014, "Positive for: Skin lesion"); (AR 547, Feb. 4, 2014, "saw wound care and placed in a Una boot."); (AR 494, May 29, 2014, "Left lower leg discolored edematous w/ breakdown of superficial dermal tissue."); (AR 488, July 1, 2014, "Left lower leg erythema and oozing from 4 cm by 2 cm area.").

Accordingly, Clinicas de Salud referred Claimant to simultaneously seek treatment at the Wound Care Center at Pioneers Medical Hospital. (AR 463.)

Claimant received treatment at the Pioneers Wound Care Center from January 23, 2014 through July 2, 2014. (AR 458-73, 583-88.) During that time, Virgilio Almaden, M.D., tended to Claimant and treated his left leg. Dr. Almaden diagnosed Plaintiff with "[v]enous leg ulcer with inflammation" on January 23, 2014. (AR 459.) On January 30, 2014, Dr. Almaden diagnosed Claimant with "[c]hronic venous hypertension with ulcer inflammation, left lower medial leg and ankle." (AR 461.) On that date, Dr. Almaden also concluded that Claimant no longer had DVT. (AR 461, "I did a repeat Doppler study on January 23, 2014 and this does not show any more deep vein thrombosis.").

 A few weeks later, on February 13, 2014, Dr. Almaden observed that Claimant had "three superficial ulcers" on his left leg. (AR 465.) And a few weeks after that, on February 27, 2014, Dr. Almaden discharged Claimant as he was "[P]resently . . . healed." (AR 467.) Upon discharge, Dr. Almaden referred Plaintiff to a specialist to treat Plaintiff's "multiple varicose veins and possibly abnormal perforators and correct his chronic venous hypertension." (AR 467.) Claimant's discharge diagnoses were "chronic venous leg ulcers with inflammation, left lower medial leg," "essential hypertension," and "history of deep vein thrombosis, left femoral veins; now resolved." (AR 467.)

As a result of Dr. Almaden's referral, Claimant visited the offices of Norman Baron, M.D., of the Desert Vein Clinic on April 9, 2014. (AR 453.) While there, Dr. Baron performed a venous duplex on the patient. (AR 453.) Upon examination, Dr. Baron found that "The left great and small saphenous veins have severe reflux as does a perforating vein near the medial malleolus. The right great saphenous vein has stupendous reflux and there is also a perforator at the medial malleolus with severe reflux. No fresh DVT is seen." (AR 453.) Dr. Baron further observed that Claimant had edema in the left and right legs, albeit more severe in the left. (AR 456.) In his final impression of Plaintiff, Dr. Baron concluded that "The patient has signs and symptoms of chronic venous hypertension, affecting daily function, despite a month long trial of . . .

compression stockings, legs elevation avoiding prolonged standing, exercise" and that he had "chronic deep venous thrombosis within the left common femoral and mid femoral veins." (AR 457, 474.)

A few months later, on June 5, 2014, Claimant presented himself to Dr. Baron for a follow-up. (AR 442.) In his notes, Dr. Baron stated that "The ulcer of the left ankle is trying to stage a recurrence" and that Claimant "would benefit from closure of the left great and small saphenous veins and the left ankle perforating vein." (*Id.*) Dr. Baron summarized his findings as follows: "Positive for hypercoagulability and severe saphenous vein and perforating vein reflux with previous left leg DVTs and a PE with clinically significant stenosis of the left femoral vein." (AR 442.)

Claimant's last two medical records describe a visit to the Pioneers Wound Care Center on July 2, 2014 and an office visit to Clinicas de Salud on July 8, 2014. (AR 583, 475.) Dr. Almaden examined Plaintiff at Pioneers. (AR 583.) Dr. Almaden found that Plaintiff had "edema of the left lower extremity from chronic venous insufficiency, and history of DVT" in addition to "erythema on the left medial lower leg . . . suggestive of: Chronic stasis dermatitis, chronic venous hypertension, and venous reflux disease." (AR 583-84.) Upon discharge, Dr. Almaden noted that Claimant should continue to see Dr. Baron for "correction of his venous reflux disease" and that Claimant should return to Pioneers in a week." (AR 584.) A few days later, Claimant was seen by Marcia Rickard, N.P., who determined that Plaintiff had "some swelling in leg above dressing." (AR 475.)

## 2. Medical Experts

As previously stated, Claimant filed for disability benefits on April 12, 2012. Soon after applying for benefits, a number of medical experts opined on the severity of Plaintiff's impairments and on the degree to which they affect his daily function. These opinions formed part of the record before the ALJ at Claimant's hearing. Also part of the record were two expert opinions that pre-date Plaintiff's application. Prior to filing for disability benefits with the SSA, Claimant filed for benefits with the California

Department of Social Services.  (*See* AR 196, 225, 229.)  Accordingly, two expert opinions rendered in 2011, at the request of California authorities, were also included in the record before the ALJ.

### a. Physical Expert Examinations

On October 8, 2011, Plaintiff underwent an internal medicine consultation by examining physician Seung Ha Lim, M.D., at the request of the California Department of Social Services.  (Exhibit 2F, AR 225.)  Dr. Lim performed a physical examination of Plaintiff and observed that "the patient presents pain on motion, paravertebral tenderness, and decreased range of motion of the neck and back without any signs of radiculopathy." (*Id.* at 228.)  Dr. Lim further concluded that "patient has a slow gait with limping on the left complaining of back and left lower extremity pain but does not require the use of assistive devices for ambulation at this time."  (*Id.*)  Lastly, Dr. Lim noted that Claimant presented with "moderate edema, erythema, and warmth of the left lower extremity." (*Id.*)  As a result of her findings and based upon the medical information available to her, Dr. Lim opined that Plaintiff (1) can stand and/or walk about four hours in an eight-hour workday with appropriate breaks; (2) can sit for six hours in an eight-hour day with appropriate breaks; (3) is capable of lifting and/or carrying twenty pounds occasionally and ten pounds frequently; (4) may occasionally push and pull with the left lower extremity, and (5) can climb or stoop on occasion.  (*Id.*)

On June 11, 2012 and at the request of the SSA, Robert J. MacArthur, M.D., an orthopedic specialist, examined Claimant.  (Exhibit 5F, AR 244.)  Prior to examining Claimant, Dr. MacArthur reviewed and summarized Claimant's medical record.  (*Id.*)  In pertinent part, Dr. MacArthur noted that Plaintiff had a history of deep vein thrombosis but that his "left leg swelling" has since "resolved," that Plaintiff had received a diagnosis for ankylosing spondylitis with low back and neck pain; and that x-rays "revealed mild osteoarthritis."  (*Id.*)  Dr. MacArthur went on to observe that Plaintiff's left lower extremity had "some skin changes consistent with history of chronic swelling in the past," that he had "severe limitation of motion" in his cervical spine, and a "slight

limitation of motion" in his thoracolumbar spine. (*Id.* at 246.) After examining Claimant, Dr. MacArthur issued the following "diagnostic impression" of Claimant's health: (1) "Severe multilevel degenerative disc disease, facet arthropathy with no motor or sensory radiculopathy" and (2) "Age appropriate degenerative disc disease of the lumbar spine." (*Id.* at 247.) Dr. MacArthur concluded that both conditions would "limit the claimant's activities." (*Id.* at 248.)

In light of his assessment, Dr. MacArthur concluded that Claimant had the following exertional limitations: that he could (1) lift and/or carry twenty pounds occasionally and ten pounds frequently; (2) push and/or pull twenty pounds occasionally and ten pounds frequently; (3) stand and/or walk, with normal breaks, up to six hours in a normal eight-hour workday; (4) sit, with normal breaks, up to six hours, but that he needed to periodically alternate sitting and standing to relieve discomfort; and (5) that he did not need a cane for ambulation. (*Id.*) As for postural limitations, Dr. MacArthur concluded that Plaintiff was capable of: (1) climbing ramps and stairs frequently; (2) balancing frequently; but could never (3) climb ladders, ropes, or scaffolds; or (4) stoop, kneel, crouch or crawl due to "minimal motion of the cervical spine." (*Id.* at 248.) Dr. MacArthur noted no manipulative or visual/communicative limitations. (*Id.* at 248-49.) Dr. MacArthur's only other assessed limitation was that Claimant had to avoid all exposure to unprotected heights. (*Id.* at 249.)

On January 2, 2013, Dr. K. Mauro, M.D., performed an internal review of Claimant's physical impairments on behalf of the SSA. (Exhibit 11F, AR 340.) Claimant's medical record, Dr. Mauro noted, "establishes diagnoses of Ankylosing spondylitis; chronic anticoagulation s/p LLE (lower left extremity) DVT in 02/2011." (*Id.* at 341.) Dr. Mauro added that Plaintiff "has been taking warfarin since diagnosis of a LLE DVT," that a "C- & T-spine X-ray documented advanced ankylosing spondylitis," that a "MRI documented partial ankylosis of bilateral SI joints" and that Dr. MacArthur "documented markedly restricted neck ROM." (*Id.*) As a result of these findings, Dr. Mauro concluded that it was appropriate to deem Claimant as having the residual

functional capacity ("RFC") to perform light work with an overhead work limitation due to "ankylosing spondylitis" and hazard precautions because of Claimant's "chronic anticoagulation." (*Id.*)

The last medical opinion regarding Plaintiff's physical abilities is an undated RFC assessment. (Exhibit 7F, AR 328.) The assessment states that Lenz' primary diagnosis was "ankylosing spondylitis." (*Id.*) The assessment goes on to state that Claimant's exertional limitations are as follows: he can stand for at least two hours in an eight-hour workday; he can sit for a total of six hours in an eight-hour workday; and he can push and pull without limitation. (AR 329.) The author of the assessment added that this exertional limitation was supported by the fact that Claimant can "[s]tand/walk up to 4 hours cumulative, due to episodic LLE swelling." (*Id.*) As for postural limitations, the assessment concluded that Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but that he could never climb ladders, ropes or scaffolds, or balance. (AR 330.) The author of the assessment stated that the postural prognosis was "[l]imited due to ankylosing spondylitis and [ ] chronic anticoagulation." (*Id.*) As to manipulative limitations, the author concluded only that Claimant was limited in his ability to reach overhead. (*Id.*, "No overhead work due to ankylosing spondylitis with neck ROM deficits.") Finally, the assessment stated that Claimant could "no[t] work at heights or w/ hazardous machinery due to chronic anticoagulation." (AR 331.) With regards to Claimant's credibility the assessment found the following: "Allegations are deemed partially credible, supported for causality by MER (medical record) but fully disabling severity is not established by objective findings as cited in the consult." (*Id.*)

### b. Psychological Expert Examinations

On November 12, 2011, Plaintiff was examined by Gabriela Gamboa, Psy.D., at the request of the California Department of Social Services. (Exhibit 3F, AR 229.) After performing a number of tests on Plaintiff (*see* AR 232-33), Dr. Gamboa concluded that Plaintiff's "cognitive ability falls within the low average to borderline range." (*Id.* at 233.) She also listed the following "probable" diagnoses: (1) "Learning Disability, Not

Otherwise Specified"; (2) "Anxiety Disorder, Not Otherwise Specified"; (3) "Poor gait, degenerating disc and blood clots . . . deferred to medical specialists"; (4) "Medical problems, learning difficulties, irritability and anxiety, occupational and economic difficulties"; and (5) "GAF ("global assessment of functioning"): 49."[5]  (*Id.* at 234.)

On June 21, 2012, Romauldo R. Rodriguez, M.D., a psychiatrist, completed a psychiatric evaluation of Claimant at the request of the SSA.  (Exhibit 4F, AR 236.) After examining Claimant, Dr. Rodriguez recorded the following diagnostic impressions: (1) that Claimant had major depressive disorder and learning disorder, not otherwise specified; (2) that Claimant has experienced minimal to moderate psychological stressors over the last year; and (3) that his GAF score is 65.[6]  (*Id.* at 240).  Dr. Rodriguez went on to state that "From a psychiatric point of view, as long as this Claimant is properly treated for depression and ADHD, he could easily recover from his symptoms within twelve months."  (*Id.* at 241.)

Accordingly and based upon his impressions and findings, Dr. Rodriguez concluded that Plaintiff had the functional capacity to (1) understand, remember, and carryout simple one or two-step instructions; but that he was (2) unable to do detailed and complex instructions; (3) was "[s]lightly limited" in his ability to relate to supervisors, peers, coworkers and the public; (4) that he was "[m]oderately limited" in his ability to maintain concentration, attention, persistence, and pace; (5) that he was "[s]lightly limited" in his ability adapt to the stresses of a normal work environment; (5) that he was "[s]lightly limited" in his ability to maintain regular attendance and perform work

---

[5] GAF scores represent a "rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment."  *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998).  According to the Diagnostic and Statistical Manual of Mental Disorders, *see generally* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) (DSM-IV), a GAF score between 41 and 50 describes "serious symptoms or any serious impairment in social, occupational or school functioning."  *Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014).
[6] A GAF score of 65 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning."  *Kittelson v. Astrue*, 533 F. Supp. 2d 1100, 1111 (D. Or. 2007) (citing DSM-IV).

activities on a consistent basis; and (6) that he was "[s]lightly limited" in his ability to perform work activities with special or additional supervision. (*Id.*)

On January 22, 2013, Dr. Mauro indicated that based upon the above-mentioned psychological evaluations, Claimant has the residual functional capacity to "perform[ ] unskilled tasks in a non public setting." (Exhibit 9F, AR 336.) A medical consultant and psychiatrist, BA Smith, M.D., concurred in this finding. (Exhibit 10F, AR 339.)

**B. Vocational Expert Testimony[7]**

Vocational expert ("VE") Corinne Porter testified at Claimant's August 28, 2014 hearing. (AR 626-35.) The ALJ asked VE Porter a series of hypothetical questions that focused on what work a hypothetical individual could perform given the RFC presented by the ALJ.

The first hypothetical that the ALJ posed to the VE involved an individual who could lift and carry twenty pounds occasionally and ten pounds frequently, can stand, walk, and sit for six hours in an eight-hour work day, can occasionally push and pull with the upper and lower extremities, cannot climb ladders, ropes, or scaffolds, can frequently climb ramps and stairs, can frequently reach in all directions, including overhead, but cannot be exposed to heights, cannot climb ladders, ropes, or scaffolds, and cannot stoop, kneel, crouch or crawl. (*Id.* at 628.) The ALJ's hypothetical also directed the VE to only consider unskilled work. (*Id.*) The VE responded by noting that such an individual could not perform Claimant's past work — namely, work as a stock clerk or plumber — but that such a person could perform work as a production solderer, DOT ("Dictionary of Occupational Titles") 813.684-022, as a routing clerk, DOT 222.587-038, and as a

---

[7] The SSA often relies on vocational experts to carry its burden — at step 5 of the five-step sequential disability analysis — of demonstrating that the claimant can perform other jobs that exist in the national economy. *See generally* Carolyn A. Kubitschek & Jon C. Dubin, *Social Security Disability Law and Procedure in Federal Court* § 3:89 (Feb. 2017).

document preparer, DOT 249.587-018.[8]  (*Id.* at 629.)

For the second hypothetical, the ALJ asked the VE to consider the same individual, but to limit him to "simple, repetitive work" and "to work involving no more than occasional contact with coworkers" and no "contact with the public." (*Id.*)  The VE concluded that such an individual could perform the same jobs that the first hypothetical individual could perform.  (*Id.*)

The ALJ made another slight modification for the third hypothetical and asked the VE to consider a man with the same limitations as the first hypothetical individual, but with the "additional need to alternate sitting and standing to relieve pain and discomfort." (*Id.* at 629-30.)  The VE stated that such an individual could perform work as a production solderer or document preparer, but could not work as a routing clerk due to the need to sit or stand "at will."  (*See id.* at 630.)

For the fourth hypothetical, the ALJ asked the VE to consider the first hypothetical individual, but to instead consider that he can only stand and walk for four hours in an eight-hour workday, that he cannot climb, that he can occasionally balance, stoop, kneel, crouch, and crawl, and that he cannot engage in any bilateral, overhead reaching. (*Id.* at 631.)  After considering these modifications, the VE yet again concluded that such an individual could still perform the jobs of production solderer or document preparer.

The VE's conclusions changed for the ALJ's fifth and sixth hypotheticals.  The fifth hypothetical individual, the ALJ posited, had the same limitations as the first individual except that he could lift and carry a maximum of five to ten pounds, could stand and walk for only two hours in an eight-hour work day, and could sit for only two hours of an eight-hour workday. (*Id.*)  The VE concluded that such an individual could not perform any other work in the national economy.  (*See id.*)  The VE likewise concluded that a hypothetical individual who is "off task" for twenty percent of a

---

[8] The SSA "has taken administrative notice of the Dictionary of Occupational Titles, which is published by the Department of Labor and gives detailed physical requirements for a variety of jobs." *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.8 (9th Cir. 2007) (quoting 20 C.F.R. § 416.966(d)(1)).

workday could not perform work in the national economy.  (*Id.*)

**C. The ALJ Decision**

In order to grant disability benefits under the Social Security Act, an ALJ must conduct a five-step sequential disability analysis.  20 C.F.R. § 404.1520(a).  Those five steps, in turn, require an ALJ to inquire as to the following:

1. Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe? If so, proceed to step three.  If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1?  If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f)

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).  The claimant carries the burden of showing eligibility at steps 1 through 4.  *Garrison*, 759 F.3d at 1011; *see also* 20 C.F.R. § 404.1512(d).  At step 5, however, the Commissioner bears the burden of demonstrating that the claimant "can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999) (quoting 20 C.F.R § 404.1560(b)(3)).

After conducting this five-step analysis, here, the ALJ ultimately concluded that Plaintiff has not had a disability, as defined in the SSA, since April 12, 2012, the date

Claimant filed his application. (AR 33.) At step 1, the ALJ found that the Claimant had not been engaged in any substantial gainful activity since April 12, 2012. (AR 23.) At step 2, the ALJ concluded that Plaintiff had several severe impairments, including, "degenerative disc disease of the cervical and lumbar spine, history of deep vein thrombosis (DVT) of the left leg, history of pulmonary embolism (PE), major depressive disorder, and a learning disorder." (*Id.*) Notwithstanding the severity of these impairments, however, the ALJ concluded that none of the impairments or combination of impairments "meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," as required by step 3. (*Id.*)

Next and for purposes of assessing Claimant's ability to perform previous or other work, the ALJ announced his conclusion regarding Plaintiff's residual functional capacity ("RFC"). (*Id.* at 25.) Specifically, the ALJ concluded that Claimant has the RFC to perform "light work" as defined in 20 C.F.R. 416. 967(b) subject to the following limitations:

> [H]e is capable of lifting/carrying 20 pounds occasionally and ten pounds frequently. He is able to walk and/or stand for four hours out of an eight-hour workday while being able to sit for six hours out of an eight-hour workday. However, he should be allowed to periodically alternate between sitting and standing to relieve pain or discomfort. He is capable of pushing and/or pulling with the both the [sic] upper and lower extremities within the light exertional weight restrictions on an occasional basis. Additionally, he is able to occasionally stoop, kneel, crouch and crawl while being able to frequently climb ramps and stairs. Further, he is capable of frequent reaching in all directions but cannot perform any overhead reaching. He is restricted from climbing ladders, ropes or scaffolds and he should avoid all exposure to unprotected heights. Lastly, he is limited to work involving simple repetitive tasks and is also limited to work involving no more than occasional contact with co-worker [sic] and no public contact.

(AR 25-26.)

In assessing this RFC, the ALJ relied upon all of Claimant's symptoms, the objective medical evidence, and opinion evidence. (*Id.* at 26.) With regards to Claimant's medical records, the ALJ emphasized that "the majority of the medical evidence consists of lab work and follow-up with anticoagulation therapy after the

20

claimant suffered a PE and was diagnosed with DVT of the left lower leg in February 2011." (*Id.*) For instance, the ALJ explained, "[t]hroughout 2011 and 2012, the claimant did not report any significant symptoms with his left leg[.]" (*Id.*) The ALJ further explained that subsequent complications relating to his left leg had already healed by the time the ALJ reached his decision. (*See id.*) "[I]n June 2013, the claimant developed an ulcer on his left ankle caused by his DVT and a study showed that he had a blood clot in his leg. However, by August, his wound had healed. In January 2014, his ulcer had reappeared and he underwent wound care such that his ulcer was healed by Late February and he was discharged." (*Id.*)

With regards to Claimant's daily activities, the ALJ stated that "It is noteworthy that throughout 2011, 2012 and 2013, the claimant reported that he was able to do household chores, do yard work, and help his parents move, such that it appears he was highly functioning despite his left lower leg symptoms." (*Id.*) The ALJ went on to conclude that the RFC is supported by "the medical opinion as well as the medical evidence showing benign physical findings at both of his physical functional examinations with normal findings in his upper and lower extremities as well as improvement in his condition such that at his consultation in 2012 he was no longer limping and no longer had any symptoms with his left leg due to DVT." (*Id.*) "Lastly," the ALJ concluded, "there is no medical source statement from a treating physician suggesting functional limitations more restrictive than those functional limitations included in the residual functional capacity determined herein." (*Id.*)

Based upon Claimant's assessed RFC, the ALJ concluded that Lenz was unable to perform his past relevant work as a stock clerk or construction worker. (*Id.* at 31.) Yet at step 5, the ALJ concluded that Claimant was, nonetheless, capable of performing other work. (*Id.* at 32.) Specifically, the ALJ stated that based on "claimant's age, education, work experience, and residual functional capacity," he was capable of performing

unskilled occupations requiring light to sedentary work such as "production solderer, with 30,000 jobs nationally and document preparer, with 25,000 jobs nationally."[9]   (*Id.*)

## **IV. DISCUSSION**

In his motion for summary judgment, Plaintiff argues that this Court should reverse the final decision of the Commissioner for three main reasons.  First, Plaintiff asserts that the ALJ's residual functional capacity assessment lacks the support of substantial evidence.  Second, Plaintiff avers that the ALJ failed to carry his burden, at step five, of demonstrating that Plaintiff was capable of performing other work that exists in the national economy.  Specifically, Plaintiff maintains that the ALJ erred by accepting the vocational expert's opinion that Plaintiff could perform work as a production solderer. Third, Lenz asserts that the ALJ erred by failing to consider whether Plaintiff could perform the job of document preparer in light of the fact that he was closely approaching advanced age. (Dkt. No. 14 at 7-10).  Defendant, in response, contends that the ALJ's decision is free of reversible error because it is supported by substantial evidence and because the ALJ did not otherwise err for the reasons alleged.  (Dkt. No. 15-1 at 9.)

This Court, however, need not address Plaintiff's arguments because, after close inspection of the record, it has found that the ALJ committed prejudicial legal error by ignoring crucial record evidence.[10]  The ALJ's decision, while thorough in many regards,

---

[9] The ALJ's decision also included a handful of paragraphs dedicated to Plaintiff's credibility.  (*See* AR 26-27.)  Ultimately, and for a variety of reasons including inconsistent statements, the ALJ concluded that Plaintiff was not "entirely credible." (*Id.* at 28).  Yet because this Court's decision rests on errors committed in the ALJ's analysis of the objective medical evidence and not Plaintiff's subjective testimony, the Court does not recite the ALJ's credibility finding in any detail.

[10] Numerous courts in districts throughout the country have found it appropriate to *sua sponte* raise such issues in social security cases. *See, e.g.*, *Frith v. Celebrezze*, 333 F.2d 557, 561 (5th Cir. 1964) (reversing *sua sponte* because ALJ failed to grapple with key factors during analysis); *Bridges v. Gardner*, 368 F.2d 86, 90 (5th Cir. 1966) ("a reviewing court may not abdicate its traditional judicial function, nor escape its duty to scrutinize the record as a whole to determine whether the conclusions reached are reasonable[.]") (footnotes omitted); *Gravel v. Barnhart*, 360 F. Supp. 2d 442, 452 n.24 (N.D.N.Y. 2005) (raising additional grounds of reversible error *sua sponte*); *Asmar v. Colvin*, 2017 WL 3405688, 9 n.7 (S.D. Cal. Aug. 8, 2017) (*sua sponte* finding that ALJ erred by ignoring medical findings made by the plaintiff's treating physician; *Silva v. Colvin*, 2015 WL 5023096, *13 (D.R.I. Aug. 24, 2015) ("Court may, and should raise issues *sua sponte* when the review of the record suggests that

overlooks and underestimates the type and severity of medical issues troubling Claimant's left leg, as well as his spine. Read in isolation, the decision states that Plaintiff's leg problems had become non-serious or else improved by the time Claimant applied for benefits. The decision likewise concludes that the Plaintiff had no more than "mild degenerative changes" in his spine, hips, or shoulders. Both of these conclusions, however, are untenable because they fail to take into account the opinions of treating and examining physicians who determined that Claimant was, and is, suffering from a number of chronic, leg-related ailments and that Claimant has advanced ankylosis spondylitis. Accordingly and in light of the ALJ's disregard of the medical opinions of multiple treating and examining physicians, the Court reverses and remands to the Commissioner.

## A. Evaluation of Medical Opinions in the Ninth Circuit

ALJs are required to "evaluate every medical opinion" in the record "[r]egardless of its source." 20 C.F.R. § 404.1527(c). "[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability[.]" Social Security Ruling ("SSR") 96-5 at *2-3. Not all opinions, however, are counted equally.

"Generally," the ALJ must "give more weight to medical opinions from [   ] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." *Id.* § 404.1527(c)(2); *see also Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."); *Smolen*, 80 F.3d at 1285 ("Because treating physicians are employed to cure and thus have a greater opportunity to know and

justice requires it."); *Wilting v. Astrue*, 2010 WL 3023387, at *7 (D. Colo. July 29, 2010) (finding that court must *sua sponte* address errors revealed upon inspection of the record).

observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians.").

A "treating source" is a medical source who currently or has provided the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant. *Id.* § 404.1527(a)(2). A treating source may have evaluated the patient "only a few times or only after long intervals" so long as the "nature and frequency of the treatment or evaluation is typical for [the] condition." *Id.* A physician who a claimant visits because of the "need to obtain a report in support of [a] claim for disability," is never a treating source. *Id.*

The regulations provide that a treating doctor's opinion will be given "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(c)(2). A treating doctor's opinion that is not contradicted by another doctor, "may be rejected only for 'clear and convincing' reasons." *Lester*, 81 F.3d at 830. Accordingly and in order for an ALJ to reject the opinions of a treating physician, the ALJ must first "make[ ] findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Smolen*, 80 F.3d at 1285.

The opinions of examining physicians are also entitled to great weight. *See Lester*, 81 F.3d at 830. An ALJ must similarly provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). "And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester*, 81 F.3d at 830-31. Stated plainly, "[a]n ALJ may reject testimony of an examining, but non-treating physician, in favor of a nonexamining, nontreating physician when he gives specific, legitimate reasons for doing so, and those reasons are supported by substantial record evidence." *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir.1995).

The opinions of medical specialists are also owed particular deference. The regulations state that the SSA will "generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5).

**B. ALJ's Failure to Evaluate Treating/Examining Sources' Medical Opinions**

Here, the ALJ failed to address a significant portion of Plaintiff's medical records, which include the uncontradicted professional opinions[11] of treating and examining physicians. This alone constitutes error. *See Marsh v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) (ALJ erred by giving "no reasons for not mentioning" a treating physician or his medical notes); *Garrison*, 759 F.3d at 1012 ("Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs."); *Smolen*, 80 F.3d at 1272 (ALJ erred by ignoring medical evidence of Claimant's other impairments). Such error, moreover, is not harmless as a reasonable ALJ easily could have reached a different disability determination had he or she examined a complete record. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) ("a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.").

**1. Regarding Claimant's Leg**

In the decision, the ALJ states that "the majority of the medical evidence consists of lab work and follow-up with anticoagulation therapy after the claimant suffered a PE and was diagnosed with DVT of the lower left leg in February 2011." (AR 27.) He goes on to explain that Claimant did not "report any significant symptoms" in 2011 and 2012

_____

[11] "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). Accordingly, and to the extent that the medical opinions referenced, below, contain judgments regarding Plaintiff's symptoms, diagnosis and prognosis, the Court finds that they entitled to deference as medical opinions.

and that the only subsequent, major medical issue to develop was "an ulcer in his left ankle caused by his DVT and a study [that] showed he had a blood clot in his leg." (AR 27.) The ALJ moreover concludes that by 2012 Plaintiff "no longer had any symptoms with his left leg due to DVT" and that his ulcer quickly healed after it appeared in June 2013 and after it reappeared in January 2014. (*See id.* at 27, 30.) These findings, however, are laced with legal error because they ignore objective medical evidence demonstrating that Claimant's left leg issues were still serious and had not healed as of Claimant's application date.

For one, the ALJ's decision does not mention the fact that Claimant sought and received emergency treatment for his left leg in January 2013. At that time, an emergency doctor performed an ultrasound of Plaintiff's left leg and diagnosed him with "deep venous thrombosis of the left common femoral vein and left popliteal vein" (*i.e.*, the exact same diagnosis he received in 2011). This diagnosis, however, is completely omitted from the ALJ's decision, along with any mention of a second hospitalization. This objective medical evidence, moreover, squarely contradicts the ALJ's conclusion that Claimant no longer had any DVT-related issues as of 2012.

Two, the decision also fails to discuss the medical findings from Claimant's third emergency hospitalization. Although the ALJ does mention the fact that Claimant developed an ulcer in June 2013, he nonetheless ignores the diagnoses of the emergency room physicians. Upon discharge, Plaintiff was diagnosed with "left lower extremity cellulitis with nonhealing venous stasis ulcer." Yet this diagnosis is not mentioned anywhere in the ALJ's opinion.

Finally, the decision also ignores a host of treatment records addressing Claimant's leg ailments in 2013 and 2014. For instance, the ALJ ignores treatment records from Claimant's primary physician, Nurse Jones,[12] indicating that he had "open lesions,"

---

[12] Nurse practitioners qualify as an "other source" that can provide evidence about "the severity of the claimant's impairment(s) and how it affects the claimant's ability to work." *Garrison*, 759 F.3d at 1013 (brackets omitted) (citing 20 C.F.R. § 404.1513(d)).

"ulcerations," and ulcers on his left leg between October and December 2013.  Such an omission contradicts the ALJ's assertion that the June 2013 ulcer had healed by August 2013.

Moreover and more crucially, the opinion also fails to mention the specialists who tended to Claimant in 2014.  Although the ALJ does mention the reoccurrence of Claimant's ulcer in January 2014, he yet again ignores the course of treatment that followed the reappearance of that ulcer.  Specifically, the ALJ's opinion fails to discuss the medical opinions of Dr. Virgilio Almaden, a wound specialist who tended to Claimant at least five times between January 23, 2014 and July 2, 2014.  While Dr. Almaden did, indeed, diagnose, Claimant with a venous leg ulcer, he also diagnosed Plaintiff with chronic venous hypertension and chronic venous leg ulcers.  But the ALJ's decision ignores these two medical diagnoses and otherwise fails to afford Dr. Almaden the deference he is owed as a specialist.  *See* 20 C.F.R. § 404.1527(c)(5).

In addition, the ALJ opinion also overlooks the fact that Dr. Almaden referred Plaintiff to Dr. Norman Baron, a vein specialist, for purposes of correcting Claimant's chronic venous hypertension.  After performing a venous duplex and examining Claimant on at least two occasions, Dr. Baron diagnosed Plaintiff with chronic venous hypertension, severe saphenous and perforating vein reflux, and stenosis of the left femoral vein.  The ALJ's decision, however, does not afford Dr. Baron any deference as a specialist, does not discuss any of Dr. Baron's diagnoses, and does not mention any of Dr. Baron's other findings, which included an observation that Claimant's ulcer was "trying to stage a recurrence."

In sum, the ALJ erred by ignoring these medical opinions.  At the very least the medical opinions of the emergency room physicians, Nurse Jones, Dr. Almaden, and Dr. Baron, were those of examining physicians.  Accordingly, the ALJ was obliged to accept the above-mentioned opinions unless he provided clear and convincing reasons for rejecting them.  *See Lester*, 81 F.3d at 830-31.  Yet no such clear and convincing reasons appear in the decision.  Moreover, these medical opinions are uncontradicted by any

other evidence in the record. All but one of the medical experts rendered their functional assessment before Claimant's second hospitalization for DVT, and none of them mention any treatment records from 2013 or 2014. Accordingly, the ALJ's reliance on those expert opinions carries very little weight as none of those opinions address Claimant's chronic deep vein thrombosis, cellulitis with nonhealing venous ulcer, chronic venous hypertension, and venous reflux disease, as diagnosed by emergency room physicians, Dr. Almaden, and Dr. Baron.

The ALJ, therefore, erred by ignoring the above-mentioned objective medical evidence and subsequent diagnoses. "Because a court must give 'specific and legitimate reasons' for rejecting a treating doctor's opinions, it follows even more strongly that an ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them." *Marsh*, 792 F.3d at 1172-73. The ALJ's decision "totally ignore[s]" virtually all of the treating and/or examining medical opinions from 2013 and 2014 along with the accompanying objective medical findings. As such, the Court concludes that the ALJ erred as a matter of law by impliedly rejecting these medical opinions without "specific and legitimate" reasons for doing so. *See Garrison*, 759 F.3d at 995 (concluding, among other things, that ALJ erred by ignoring "most of" claimant's treatment records, including medical test results and treatment notes, and failing to recognize that they were owed controlling weight because no expert disagreed with those treatment records); *Smolen*, 80 F.3d at 1282 (where "uncontradicted objective medical evidence" demonstrates presence of a physical impairment, the ALJ errs by ignoring those impairments without further explanation); *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996) (holding that ALJ erred by not explicitly rejecting opinion of examining medical professional or offering "specific, legitimate reasons" for crediting another physician over the examining professional).

## 2. Regarding Claimant's Spine

In his decision, the ALJ also rejects Plaintiff's allegations regarding his back and neck pain because "[t]here is no evidence in the record showing that he presented with

significant physical findings other than tenderness . . . [, a] decreased range of motion . . . and normal to mild degenerative changes" in the hips, shoulder, and spine. (AR 27.) Yet this conclusion, like the ALJ's conclusion regarding Claimant's left leg, is infected with legal error because it selectively ignores those medical opinions that detract from the ALJ's findings.

In 2006, Dr. Haynes performed two X-rays of Plaintiff's thoracic and cervical spine, both of which documented only mild changes. But in 2011 and 2012, Dr. Haynes performed another five X-rays which revealed "vertebral ankylosis" in Claimant's chest, mild arthritis in his hips, possible ankylosis spondylitis in his sacroiliac joints, advanced ankylosis spondylitis in his cervical and thoracic spine, and minor changes in his right shoulder. The ALJ, however, selectively omits Dr. Haynes' conclusions that Claimant has advanced ankylosis spondylitis in the spine and vertebral ankylosis in the chest, and instead, only references the earlier 2006 findings and the later findings documenting minor changes in his hips and shoulders. Such selective omission of a treating and/or examining physician's opinions is improper. *See Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ("An ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.").

Moreover and more importantly, the ALJ improperly ignored those portions of Dr. Hayne's medical opinion that document a serious condition. As a radiologist who evaluated Claimant at least seven times, Dr. Haynes is, at the very least, owed deference as an examining physician. Accordingly, the ALJ was required to provide clear and convincing reasons for rejecting Dr. Haynes' conclusions that Claimant has advanced ankylosis spondylitis in his spine and vertebral ankylosis in his chest. No such reasons, however, can be found because the ALJ omitted these medical findings and opinions altogether. Accordingly, and because the ALJ failed to mention Dr. Haynes' diagnoses of advanced ankylosing spondylitis and vertebral ankylosis, the Court concludes that the ALJ erred. *See Smolen*, 80 F.3d at 1282 (where "uncontradicted objective medical evidence" demonstrates presence of a physical impairment, the ALJ errs by ignoring

those impairments without further explanation); *Nguyen*, 100 F.3d at 1464 (holding that ALJ erred by not explicitly rejecting opinion of examining medical professional or offering "specific, legitimate reasons" for crediting another physician over the examining professional).

### C. Remand for further proceedings

Plaintiff requests that the Court reverse and remand for immediate payment of benefits. (Dkt. No. 14 at 10.) Defendant, in turn, contends that the case should be remanded for further proceedings. (Dkt. No. 17 at 2.)

As a general matter, when reviewing the Commissioner's final decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *see also Moisa v. Barnhart*, 367 F.3d 882, 886-87 (9th Cir. 2004) (stating that remand is appropriate in most social security cases). A reviewing court may reverse and remand when (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; or (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Garrison*, 759 F.3d at 1020; *see also Orn*, 495 F.3d at 640; *Benecke*, 379 F.3d at 595.

Given the tenor of the ALJ's error, the Court finds it appropriate to remand for further proceedings. The opinions of the above-mentioned treating and examining physicians shed light on the severity and chronic nature of Claimant's impairments, but they do not, in and of themselves, demonstrate a disability. For example, none of the treating and examining physician opinions omitted by the ALJ discuss Claimant's functional limitations or his ability to perform daily activities. Accordingly, the Court remands so that the Commissioner may determine what Claimant's residual functional capacity is in light of those medical records ignored by the initial decision.

////

**V. CONCLUSION**

For the reasons set forth above, this Court recommends **GRANTING** Plaintiff's Motion for Summary Judgment and **DENYING** Defendant's Cross-Motion for Summary Judgment.

This Report and Recommendation is submitted to the Honorable Janis L. Sammartino, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **October 31, 2017**. The document should be captioned "Objections to Report and Recommendation." Any reply to the Objections shall be served and filed on or before **November 14, 2017**. The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED**.

Dated: October 9, 2017

Hon. Peter C. Lewis
United States Magistrate Judge